# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| Darryl Henderson, | Case No.: 2:16-cv-00276-JAD-CWH |
| Plaintiff | **Order (1) Granting in Part and Denying in Part Motion for Summary Judgment and (2) Granting Motion to Seal** |
| v. | |
| Nevada Department of Corrections, et al., | [ECF Nos. 41, 43] |
| Defendants | |

Darryl Henderson's right earlobe was partially torn from his head during a physical altercation that he had with correctional officers while he was an inmate in the care of the Nevada Department of Corrections (NDOC). Henderson's injury required stitches and later developed into a keloid—abnormal scar tissue. Henderson sues the NDOC; correctional officers Martin Urriola, Efrain Lona, and Christopher Zuniga; and medical doctor Romeo Aranas for actions related to the altercation and his subsequent medical care. He claims that the defendants retaliated against him for filing prison grievances, used excessive force against him, and were deliberately indifferent to his serious medical needs. Henderson also alleges that the defendants are liable under state law for intentional infliction of emotional distress (IIED) and assault and battery.

The defendants move for summary judgment on all claims and to seal six of their summary-judgment exhibits.[1] I find that compelling reasons exist to seal the judicial records, so I grant the defendants' motion for that relief. Henderson doesn't raise any triable issues of fact on his deliberate-indifference and IIED claims but he does raise them on his excessive-force, retaliation, and assault-and-battery claims, and the defendants have not demonstrated that they

---

[1] ECF Nos. 41 (summary-judgment motion), 43 (motion to seal).

are entitled to any form of immunity on these claims. I therefore grant the defendants' summary-judgment motion in part and order the parties to a mandatory settlement conference on Henderson's excessive-force, retaliation, and assault-and-battery claims.

**Background**

On October 19, 2013, while he was an inmate at the High Desert State Prison (HDSP), Henderson's right earlobe was partially torn from his head during a physical altercation with correctional officers. Henderson received medical treatment for his injury. The laceration was stitched the same day at the University Medical Center and the sutures were removed a week later by Dr. Aranas at the HDSP. Six months later, Henderson filed a medical kite reporting that his ear was bothering him. The NDOC's medical staff discovered that Henderson had developed a keloid. Henderson filed six more medical kites complaining that the keloid was growing, painful to the point of keeping him awake, itchy, causing his ear to ring and bleed, and making him deaf. Henderson repeatedly asked for surgery to remove the keloid but received only non-surgical treatments from the NDOC's medical staff. Henderson claims that he got surgery to remove the keloid after he was released from the NDOC's custody. These facts are not disputed; where the parties disagree is how the physical altercation occurred.

**I.      Defendants insist that they used only necessary and proportional force.**

Correctional officer Urriola explains that while the inmates were exiting their cells to go to dinner, Henderson approached Urriola "in an aggressive manner with his hands in his pockets."[2] Henderson's behavior led Urriola to believe that Henderson had contraband on his person, so Urriola ordered Henderson to put his hands on the wall. Henderson initially refused but after he complied, Urriola "began a clothed body search for contraband." Henderson,

_____

[2] ECF No. 42 at 7, ¶¶ 5–8.

however, "kept removing his hands from the wall[,] so Urriola ordered several times "not to take his hands off the wall and advised him that such behavior is taken as an act of aggression." Urriola recounts that Henderson then "came off the wall in an aggressive manner, swinging his left arm towards me" "[a]t which point I used . . . Henderson's momentum to spin him around and immediately place him on [the] ground face down." Urriola then repeatedly yelled for Henderson to "stop resisting," but Henderson continued trying to get on his knees.[3]

Urriola next heard officer Zuniga, who was stationed in the control room, fire a blank shot.[4] Henderson, whose left hand was hidden under his body, continued to resist. Officer Lona then "arrived on the scene, assisted with securing Mr. Henderson's left arm, and eventually applied wrist restraints." Medical was then called to evaluate Henderson and discovered that his right earlobe had been lacerated during the altercation, which Urriola suspects was caused by his watch band.[5]

## II.     Henderson claims that he was attacked for no reason other than officer animus.

Henderson tells a different story, which begins a day or two before the altercation when Urriola randomly pat-searched Henderson while he was on his way to eat. Henderson claims that another correctional officer witnessed the search and "sarcastically" told Urriola that Henderson liked to file grievances and would file one against Urriola for the search.[6] Henderson explains that he had filed a grievance against that officer for allegedly challenging him to fight.[7]

---

[3] *Id.*

[4] *Id.* at 7–8, ¶¶ 9–14.

[5] *Id.* Lona's and Zuniga's descriptions of the altercation are consistent with Urriola's account. ECF No. 42 at 17–20 (Lona's declaration), 22–24 (Zuniga's declaration).

[6] ECF No. 46 at 22, ¶¶ 3–4.

[7] *Id.* at ¶ 5.

When Henderson returned from the recreation yard on the day of the altercation, he noticed that his "cell had been searched and left in disarray."[8]  Urriola was working Henderson's housing unit that day and "the only officer present on the tier[,]" so Henderson asked Urriola if he had searched and messed up Henderson's cell.  Urriola said that he hadn't.  Henderson asked Urriola to call a lieutenant so Henderson could voice a complaint, but Urriola refused to do so.  Urriola then ordered Henderson to get on the wall and told Henderson that he had gotten what he deserved for being a snitch.  Henderson theorizes that this statement was "a clear reference to the event of the previous day when" the other correction officer told Urriola that Henderson liked to file grievances and would file one against Urriola.  Henderson declares that he went back to his cell and asked Urriola and the other unit officers to call a lieutenant, but they refused do to so.  Henderson recounts that he and Urriola "then engaged in a verbal exchange" in which Urriola yelled that he was "gonna fuck [Henderson's] baby's moma [sic]."[9]

Henderson asserts that later the same day when Zuniga was opening the cell doors to let the inmates out for dinner, Zuniga did so "in a very unusual manner" that resulted in Henderson being left alone in the unit after the other inmates had entered the "sallyport area."[10]  Henderson saw Urriola standing nearby wearing a black t-shirt and gloves and a "smirk on his face."  Urriola ordered Henderson against the wall—Henderson voiced his dismay but obeyed the order—and Urriola proceeded to "aggressively" pat search Henderson "for several minutes" and repeatedly threatened to take Henderson down if he came off the wall.  Henderson denies Urriola's account that he came of the wall swinging; he claims it was Urriola who "suddenly"

---

[8] *Id.* at 22–23, ¶¶ 6–14.

[9] *Id.*

[10] *Id.* at 23–24, ¶¶ 15–18, 22–27.

4

slung Henderson "off the wall to the floor and punched and kicked [him] repeatedly . . . for no justifiable reason."  Zuniga fired a blank shotgun blast and Lona "assisted" in Urriola's "unprovoked attack" of Henderson by "punching and kicking" him.[11]

<strong>Discussion</strong>

**I.      Defendants' summary-judgment motion [ECF No. 41]**

      **A.      Summary-judgment standard**

      Summary judgment is appropriate when the pleadings and admissible evidence "show there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[12]  When considering summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party.[13]  In deciding a motion for summary judgment, "[c]redibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ."[14]  If reasonable minds could differ on material facts, summary judgment is inappropriate because its purpose is to avoid unnecessary trials when the facts are undisputed, and the case must then proceed to the trier of fact.[15]

      If the moving party satisfies Rule 56 by demonstrating the absence of any genuine issue of material fact, the burden shifts to the party resisting summary judgment to "set forth specific facts showing that there is a genuine issue for trial."[16]  "To defeat summary judgment, the

---

[11] *Id.*

[12] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)).

[13] *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

[14] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

[15] *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995); *see also Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).

[16] *Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 323.

nonmoving party must produce evidence of a genuine dispute of material fact that could satisfy its burden at trial."[17]

## B. Henderson hasn't shown that the defendants were deliberately indifferent to his serious medical needs.

Henderson's first claim for relief is under 42 U.S.C. § 1983 and alleges that the defendants denied him medical care in violation of the Eighth Amendment.[18] Though Henderson pleads this claim for relief "against all defendants,"[19] he concedes in response to the defendants' summary-judgment motion that he intended to plead it against only Dr. Aranas.[20]

A prisoner who claims inadequate medical care must show that prison officials were deliberately indifferent to his serious medical needs.[21] A plaintiff can prevail on a deliberate-indifference claim if he can show that prison officials denied, delayed, or intentionally interfered with medical treatment and that the delay or interference caused further injury.[22] Indifference to a prisoner's medical needs must be substantial; mere indifference, negligence, medical malpractice, or even gross negligence are insufficient to establish deliberate indifference.[23] The mere difference of medical opinion likewise does not suffice.[24] A prisoner must instead show that the course of treatment chosen was medically unacceptable under the circumstances and

---

[17] *Sonner v. Schwabe North America, Inc.*, 911 F.3d 989, 992 (9th Cir. 2018).

[18] ECF No. 21 at ¶¶ 35–43.

[19] *Id.* at 7.

[20] ECF No. 46 at 8.

[21] *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

[22] *Lemire v. Cal. Dep't of Corrections and Rehabilitation*, 726 F.3d 1062, 1081–82 (9th Cir. 2013).

[23] *Id.*

[24] *See Franklin v. State of Or., State Welfare Div.*, 662 F.2d 1337, 1344 (9th Cir. 1981).

taken in conscious disregard to his health.[25]  Personal liability under § 1983 arises only upon personal participation by the defendant.[26]  "A person deprives another of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which the plaintiff complains."[27]

Henderson argues that Dr. Aranas "knew of and disregarded [his] serious medical need for an outside surgical consult and surgical removal of the keloid."[28]  Henderson theorizes that he needed an outside surgical consultation because his medical records reflect that an unidentified doctor sought "URC" approval for a surgeon to evaluate his keloid.  URC stands for the "Utilization Review Committee," which is responsible for approving all outside medical consultations.[29]  But there is no evidence that Dr. Aranas knew about Henderson's keloid, any of his medical kites, or his requests to have the keloid removed.  Nor is there any evidence that Dr. Aranas knew about the request for URC approval or that committee's ruling.  Dr. Aranas declares that his only interaction with Henderson was removing the sutures from his right ear on October 30, 2013,[30] and he "was not aware of Mr. Henderson's medical kites detailing the keloid [that] he had developed and his requests for surgery."[31]  Dr. Aranas transitioned from being a physician at HDSP to the NDOC's medical director eight months before Henderson first

---

[25] *See Toguchi v. Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004).

[26] *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

[27] *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988) (brackets and internal quotation omitted).

[28] ECF No. 46 at 11.

[29] *Id.* at 9; ECF No. 44-4 at 4 (sealed).

[30] ECF No. 42 at 43, ¶¶ 5–6.

[31] *Id.* at 43, ¶ 6.

complained about the keloid.[32]  Henderson's failure to show personal participation by Dr. Aranas is fatal to his deliberate-indifference claim.

This claim also suffers from another defect: Henderson received a surgical consultation while in the NDOC's custody, just not from an "outside" surgeon, and the surgeon didn't recommend surgery to treat the keloid.  Dr. Aranas declares that if he had been aware of Henderson's medical requests, he would have reviewed Henderson's medical file "to find that he received pain medication, instruction on non-pharmaceutical measures to relieve his pain, including massage, hydrocortisone ointment, steroid injections, and Dr. Jurani's recommendation not to proceed with surgery."[33]  Dr. Aranas explains that "Dr. Jurani was a trained surgeon who was briefly employed by the NDOC in 2015."[34]  Henderson's "progress notes" contain an entry that is consistent with Dr. Aranas's statement that Dr. Jurani recommended against surgery.[35] This entry reflects that Henderson was advised that surgery "will leave no earlobe" and the keloid could "come back bigger" after surgery.[36]  Henderson was given two injections instead.[37] Another entry one month later reiterates that surgery was not recommended and that Henderson "agrees further injections will probably not be very helpful."[38]  There is no evidence that Henderson requested or received further treatment for the keloid.

---

[32] *See id.* at ¶ 3.  Dr. Aranas declares that he became the NDOC's medical director in August 2013.  Henderson submitted his first medical kite about his ear on April 30, 2014.  ECF No. 44-5 at 2 (sealed); *accord* ECF No. 21 at ¶ 24.

[33] *Id.* at ¶ 10.

[34] *Id.* at ¶ 11.

[35] ECF No. 44-4 at 3 (sealed).

[36] *Id.*

[37] *Id.*

[38] *Id.* at 2.

Henderson's only evidence that the treatment he received was not medically acceptable under the circumstances is his declaration that he got the keloid surgically removed after he was released from the NDOC's custody.[39] But Henderson's declaration that he later got surgery is not sufficient to raise a triable issue of fact that the non-surgical treatment he received while in the NDOC's custody was medically unacceptable under the circumstances. Thus, I grant the defendants' summary-judgment motion on Henderson's deliberate-indifference claim.

### C. Factual disputes preclude summary judgment on Henderson's excessive-force and assault-and-battery claims.

Henderson's second claim for relief is under 42 U.S.C. § 1983 and alleges that the defendants used excessive force against him in violation of the Eighth and Fourteenth Amendments.[40] Though Henderson pleads this claim for relief "against all defendants,"[41] he concedes in response to the defendants' summary-judgment motion that he did not intend to plead it against Dr. Aranas.[42] Henderson's fourth claim for relief is for common-law assault and battery and is alleged "against all defendants[,]"[43] but Henderson concedes that he did not intend to plead this claim against Dr. Aranas either.[44]

"[T]he unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eight Amendment."[45] In the prison context, "the core judicial

---

[39] ECF No. 46 at 24, ¶ 32.

[40] ECF No. 21 at ¶¶ 44–54.

[41] *Id.* at 8.

[42] ECF No. 46 at 4.

[43] ECF No. 21 at 9.

[44] ECF No. 46 at 15.

[45] *Hudson v. McMillian*, 503 U.S. 1, 5 (1992) (quotation omitted).

inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."[46]  In *Whitley v. Albers*, the Supreme Court articulated five factors that are relevant in determining whether officers acted maliciously: (1) the need for force, (2) "the relationship between the need and the amount of force used," (3) "the extent of the injury inflicted," (4) "the extent of the threat to the safety of staff and inmates," and (5) "any efforts made to temper the severity of a forceful response."[47]  "The standard for common-law assault and battery by a police officer . . . mirrors the federal civil[-]rights[-]law standard: Liability attaches at the point at which the level of force used by a peace officer exceeds that which is objectively reasonable under the circumstances."[48]

The extent of the injury inflicted here isn't disputed, but the facts on the record about the other four factors are.  The defendants claim that they used only as much force as was necessary to restore discipline and regain control of Henderson, whom they claim started the incident by approaching Urriola in an aggressive manner and repeatedly resisted the defendants' efforts to control him.  Henderson denies the defendants' version of events, declaring that he was always physically compliant, and Urriola started the incident by leaving his cell in disarray after a search and then later attacked him for no reason with Lona's and Zuniga's help.

The amount of force that was used is also disputed.  The defendants contend that Urriola took Henderson down to the ground after Henderson suddenly came off the wall and turned left, supposedly to swing at Urriola.  Urriola then struggled to restrain Henderson until Zuniga fired a blank shot and Lona removed Henderson's left arm from beneath his body and applied wrist

---

[46] *Id.* at 6–7.

[47] *Whitley v. Albers*, 475 U.S. 312, 321 (1986).

[48] *Ramirez v. City of Reno*, 925 F. Supp. 681, 691 (D. Nev. 1996).

restraints. Henderson counters that Zuniga opened the cell doors in a way that left Henderson alone with Urriola, who was dressed for a fight wearing a black t-shirt and gloves. Urriola then pat-searched Henderson for several minutes, threatening all the while to "take [him] down" and ultimately took him down to the ground without cause. Henderson asserts that Urriola and Lona punched and kicked him while he was on the ground and that his ear was lacerated sometime during the altercation.

The defendants argue that I should reject Henderson's account because it is entirely based on his self-serving declaration. I decline to do so because Henderson offered a detailed declaration, not conclusory allegations unsupported by facts, and the defendants' account is equally based on their own self-serving declarations. Taking Henderson's account as true, if the jury finds that he did not approach Urriola aggressively but physically complied with Urriola's order to get on the wall and remained there until Urriola suddenly threw him to the floor and was prone on the ground while Urriola and Lona punched and kicked him, this would demonstrate that there was no need for force, the amount of force used was disproportionate, or Henderson didn't pose a threat to the safety of the defendants or others. Infliction of pain in the circumstances that Henderson describes would be unnecessary and wanton. Triable issues of fact thus preclude summary judgment on Henderson's excessive-force and assault-and-battery claims against Urriola, Zuniga, and Lona.

**D.    Henderson's retaliation claim is limited to Urriola's alleged actions on the day of the physical altercation.**

Henderson's third claim for relief is under 42 U.S.C. § 1983 and alleges that the defendants retaliated against him for reporting violations of his civil rights and filing and

exhausting prison grievances.[49]  Defendants argue that they are entitled to summary judgment on

this claim because Henderson didn't exhaust his administrative remedies for a retaliation claim

and he has failed to identify what grievance or reports he filed that resulted in the allegedly

retaliatory conduct by the defendants.[50]  Henderson responds that he did exhaust and has

properly identified the grievance and resulting retaliatory conduct because his "grievances

clearly reference the fact that Defendant Urriola searched his cell the following day after being

informed by a fellow officer that Mr. Henderson likes to write grievances and would file a

grievance on Defendant Urriola."[51]  The grievances also "reference the fact that Mr. Henderson

voiced his complaint about the cell search to Defendant Urriola, asked to speak with a lieutenant

to complain about the cell search, and was denied the request by Defendant Urriola" who told

"Mr. Henderson that he had 'gotten what he deserved' in the form of the search for 'being a

snitch,' a reference to c/o Dawson's previous day's remark about Mr. Henderson's propensity to

write grievances."[52]  "The grievances finally reference Defendant Urriola and Lona's violent

unprovoked attack upon Mr. Henderson."[53]

Though Henderson doesn't use the word "retaliation," the upshot of his narrative in

grievance #20062968941 is that Urriola—who's identified with details but not by name—tossed

Henderson's cell and then attacked him because another officer told Urriola that Henderson

would file a grievance for the pat-search that Urriola performed on Henderson a day or two

---

[49] ECF No. 21 at ¶¶ 55–59.

[50] ECF No. 41 at 17–21.

[51] ECF No. 46 at 12.

[52] *Id.*

[53] *Id.*

earlier.[54]  Henderson pursued grievance #20062968941 up to the second level where it was denied,[55] which is the end of the NDOC's grievance process.[56]  The defendants have not established as a matter of law that Henderson failed to satisfy the Prison Litigation Reform Act's requirement to administratively exhaust his claim that Urriola retaliated against him for his propensity to file grievances.

However, Henderson doesn't provide any evidence that Dr. Aranas, Lona, or Zuniga knew about his claimed propensity for filing grievances.  Nor does Henderson provide evidence to support his allegation that the defendants retaliated against him after the physical altercation.[57]  I therefore grant the defendants' motion for summary judgment on Henderson's retaliation claim in part as to Dr. Aranas, Lona, and Zuniga and I deny it as to Urriola.  Henderson may proceed with this retaliation claim only on the theory that Urriola retaliated by tossing his cell and physically attacking him.

### E.  Henderson fails to raise a genuine dispute that he suffered emotional distress.

Under Nevada law, the elements of a claim for relief for IIED are "(1) extreme and outrageous conduct with either the intention of, or reckless disregard for, causing emotional distress, (2) the plaintiff's having suffered severe or extreme emotional distress, and (3) actual or proximate causation."[58]  To "[be] extreme and outrageous," the alleged conduct must fall "outside all possible bounds of decency and is regarded as utterly intolerable in a civilized

---

[54] ECF No. 42 at 88–89.

[55] *Id.* at 101.

[56] ECF No. 41 at 18 (explaining that the NDOC's administrative grievance process has three levels—informal, first, and second—and "is considered exhausted" when "a decision has been rendered on a Second Level grievance").

[57] ECF No. 21 at ¶ 15.

[58] *Dillard Dep't Stores v. Beckwith*, 989 P.2d 882, 886 (Nev. 1999) (internal quotation omitted).

13

community."[59]  To establish severe emotional distress, the plaintiff must present "objectively verifiable indicia of the severity of his emotional distress."[60]  General physical or emotional discomfort is insufficient to demonstrate severe emotional distress.[61]

Defendants argue that Henderson's IIED claim fails because there is no evidence that he suffered severe or extreme emotional distress.  Henderson contends that his "complaint clearly alleges" a claim for IIED, but Henderson needs more than the unverified allegations in his second amended complaint to survive summary judgment.  Even if I could consider Henderson's unverified allegations at this summary-judgment stage, they are conclusory and don't demonstrate that he could satisfy his burden on this element at trial.[62]  He offers even less factual detail in his declaration, vaguely concluding that he "was extremely traumatized by the attack and the fact that [he] had suffered what would be a lifelong deformity to [his] ear."[63]  Henderson fails to present evidence that he suffered severe or extreme emotional distress, let alone objectively verifiable indicia of the severity of the distress he claims to have suffered, so I grant the defendants' motion for summary judgment on his IIED claim.

### F.     Fact disputes preclude summary judgment on qualified-immunity grounds.

Defendants argue that they are entitled to qualified immunity on Henderson's excessive-force and deliberate-indifference claims.[64]  I have already decided that all the defendants are

---

[59] *Maduike v. Agency Rent-A-Car*, 953 P.2d 24, 26 (Nev. 1998) (internal quotation omitted).

[60] *Miller v. Jones*, 970 P.2d 571, 577 (Nev. 1998).

[61] *Burns v. Meyer*, 175 F. Supp. 2d 1259, 1268 (D. Nev. 2001) (citing *Chowdhry v. NLVH Inc.*, 851 P.2d 459, 462 (Nev. 1993)).

[62] ECF No. 21 at ¶ 67 (alleging that the defendants caused Henderson "to endure humiliation, anxiety, embarrassment and severe emotional distress").

[63] ECF No. 46 at 24, ¶ 30.

[64] ECF No. 41 at 25–26.

entitled to summary judgment on Henderson's deliberate-indifference claim and Dr. Aranas is entitled to summary judgment on Henderson's excessive-force claim, so I address only the question of whether Urriola, Lona, and Zuniga are entitled to qualified immunity on Henderson's excessive-force claim.

"Qualified immunity protects government officers 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"[65] "To determine whether an officer is entitled to qualified immunity," the court asks, in the order it chooses, "(1) whether the alleged misconduct violated a right and (2) whether the right was clearly established at the time of the alleged misconduct."[66] "'For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"[67]

The entirety of the defendants' qualified-immunity argument is that, "[g]iven Henderson's repeated failure to comply with orders and continued resistance, objectively reasonable officers" in the defendants' positions "would not have been on clear notice that their split-second decisions to use limited force to restrain Henderson to the ground, control his arms, and restrain his wrists, as well as the decision to discharge a blank—but not live—warning shot, would violate constitutional rights."[68] But as I explained above, Henderson provides a detailed declaration that paints a different picture than what the defendants contend happened.

---

[65] *Maxwell v. Cty. of San Diego*, 708 F.3d 1075, 1082 (9th Cir. 2013) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

[66] *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).

[67] *Id.* (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).

[68] ECF No. 41 at 26.

Resolving the factual disputes in Henderson's favor and granting him all reasonable factual inferences, the record shows that the physical altercation has its genesis a day or two earlier when Urriola was informed by another corrections officer that Henderson had a propensity to file grievances and would file one against Urriola for pat-searching him. Then when Urriola worked Henderson's unit, he tossed Henderson's cell, left it in disarray, and verbally abused Henderson when he asked to report the incident to a lieutenant. Later that day, Zuniga opened the cell doors in a way that trapped Henderson alone in an area with Urriola, who was out of uniform. Henderson did not exit his cell in an aggressive manner. Henderson complied when Urriola ordered him to the wall. Urriola aggressively pat-searched Henderson for several minutes while threatening to take Henderson down to the ground. Henderson didn't come off the wall. Urriola suddenly took Henderson down to the ground and punched and kicked him. Lona then punched and kicked Henderson, too.

Henderson's account of what happened leads to the inference that Urriola and Lona used force maliciously and sadistically and that Zuniga assisted in their actions. The use of force resulted in Henderson's right earlobe being partially torn from his head, which required stitches. A reasonable officer in the circumstances that Henderson describes would have known of the right of an incarcerated person to be free from unprovoked blows that are not *de minimis* and resulted in injury.[69] Thus, I deny the defendants' motion for summary judgment on Henderson's excessive-force claim on the ground of qualified immunity.

---

[69] *See Hudson*, 503 U.S. at 9–10 (explaining that "every malevolent touch by a prison guard" doesn't "give rise to a federal cause of action" because the Eight Amendment "necessarily excludes from constitutional recognition *de minimis* uses of physical force" that are not "repugnant to the conscience of mankind" and concluding that blows that "caused bruises, swelling, loosened teeth, and a cracked dental plate are not *de minimis* for Eight Amendment purposes"); *Felix v. McCarthy*, 939 F.2d 699, 701 (9th Cir. 1991) (explaining that it has been the standard in the Ninth Circuit since 1985 that a reasonable correctional officer "would have

16

**G.      Factual disputes preclude summary judgment on discretionary-function-immunity grounds.**

Defendants argue that they are entitled to discretionary-function immunity on Henderson's IIED and assault-and-battery claims.[70]  I have already decided that all the defendants are entitled to summary judgment on Henderson's IIED claim and Dr. Aranas is entitled to summary judgment on Henderson's assault-and-battery claim, so I address only the question of whether Urriola, Lona, and Zuniga are entitled to discretionary-function immunity on Henderson's assault-and-battery claim.

Nevada's discretionary-function-immunity statute prohibits an action against an officer or employee of Nevada "based upon the exercise or performance or the failure to perform a discretionary function or duty on the part of the State or any of its agencies . . . or of any officer, employee, or immune contractor of any of these, whether or not the discretion involved is abused."[71]  To qualify, a state official's "decision must (1) involve an element of individual judgment or choice and (2) be based on considerations of social, economic, or political policy."[72]

Discretionary-function immunity is not available for intentional torts and bad-faith conduct.[73]  The Nevada Supreme Court has explained that an act or omission of bad faith is one

_____

understood that he would violate the Constitution by delivering strong blows upon a prisoner for no purpose, using force that could be characterized as 'intentional, unjustified, brutal, and offensive to human dignity'" (quoting *Meredith v. Arizona*, 523 F.2d 481, 484 (9th Cir. 1975))).

[70] ECF No. 41 at 27–28.

[71] Nev. Rev. Stat. § 41.032(2).

[72] *Martinez v. Maruszczak*, 168 P.3d 720, 729 (Nev. 2007).

[73] *Franchise Tax Bd. of Cal. v. Hyatt*, 335 P.3d 125, 139 (Nev. 2014) (holding that intentional torts are exempt from statutory discretionary-function immunity), *vacated on other grounds*, 136 S. Ct. 1277 (2016); *Sandoval v Las Vegas Metro. Police Dep't*, 756 F.3d 1154, 1168–69 (9th Cir. 2014) (explaining that immunity does not apply "where an officer's actions are attributable to bad faith" (internal quotations omitted)).

that occurs "outside the circumference of authority."[74] In short, "abuse of discretion is characterized by an application of unreasonable judgment to a decision that is within the actor's rightful prerogatives, whereas an act of bad faith has no relationship to a rightful prerogative even if the result is ostensibly within the actor's ambit of authority."[75] Viewing the facts in the light most favorable to Henderson, a reasonable juror could find that the officers acted in bad faith when Urriola attacked Henderson without provocation and when Zuniga and Lona assisted in that attack. I therefore deny defendants' motion for summary judgment on Henderson's assault-and-battery claim on the ground of discretionary-function immunity.

### H.   The NDOC is only a nominal defendant.

Finally, the defendants argue that the NDOC is entitled to summary judgment on Henderson's deliberate-indifference and excessive-force claims because it is an arm of the State of Nevada and, thus, not a proper person under 42 U.S.C. § 1983.[76] Henderson doesn't address this argument in his response.[77] The defendants' argument has merit,[78] but I note that the NDOC is identified as a "nominal defendant" in the caption of Henderson's operative pleading and is not included among the defendants later identified in that pleading.[79] This means that Henderson has not alleged any claims for relief against the NDOC. But no party addresses whether

---

[74] *Davis v. City of Las Vegas*, 478 F.3d 1048, 1060 (9th Cir. 2007) (quoting *Falline v. GNLV Corp.*, 823 P.2d 888, 892 n.3 (Nev. 1991)).

[75] *Id.* (quoting *Falline*, 823 P.2d 892 n.3).

[76] ECF No. 41 at 24–25.

[77] *See* ECF No. 46.

[78] *See Hixon v. Nev. Dep't of Corrections*, 2009 WL 10678775, at *2–3 (D. Nev. July 8, 2009) (explaining why the NDOC "is not a 'person' within the meaning of § 1983").

[79] ECF No. 21 at 1–3 (listing the NDOC in the caption but not among the "parties").

Henderson has properly sued the NDOC as a nominal defendant, so I deny the defendants' summary-judgment motion without prejudice to their ability to seek relief on that ground.

To recap: I grant summary judgment in favor of all defendants on Henderson's claims for relief alleging deliberate indifference to serious medical needs and IIED; in favor of Dr. Aranas on Henderson's claims for relief alleging excessive force, retaliation, and assault and battery; and in favor of Lona and Zuniga on Henderson's claim for retaliation. Henderson can proceed only on his claims for relief against Urriola, Lona, and Zuniga alleging excessive force and assault and battery and on his retaliation claim against Urriola. Henderson has no claims for relief against the NDOC, which is only a nominal defendant.

## II.     Defendants' motion to seal judicial records [ECF No. 43]

Defendants move to seal six of the exhibits that they use to support their summary-judgment briefs.[80] Unless a court record is one that is "traditionally kept secret," there is a "strong presumption in favor of access" to the record.[81] Parties seeking to seal a judicial record must overcome this presumption by "articulat[ing] compelling reasons supported by specific factual findings" that outweigh the traditional right of public access.[82] Unlike with sealed discovery attached to a non-dispositive motion, the "compelling reasons" standard applies with full force to dispositive motions and their attachments—even those "previously filed under seal or protective order."[83]

I have reviewed the sealed exhibits in camera, and I conclude that the defendants have shown compelling reasons to seal these judicial records because they are medical records and the

---

[80] ECF No. 43.

[81] *Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006).

[82] *Id.*

[83] *Id.* at 1179.

need to protect medical privacy is a compelling one. These judicial records consist of physical examination notes, progress notes, and medical kites. Though Henderson has placed his health at issue in this litigation, balancing the public's need to access information about Henderson's medical history against his need to maintain the confidentiality of his medical records weighs in favor of sealing these judicial records. Thus, I grant the defendants' motion to seal exhibits E–I and K to their summary-judgment motion, which are filed under seal at ECF No. 44.

## Conclusion

IT IS HEREBY ORDERED that the defendants' motion for summary judgment **[ECF No. 41] is GRANTED in part:**

- Summary judgment is granted in favor of all defendants on Henderson's first claim for relief alleging deliberate-indifference of serious medical needs and fifth claim for relief alleging intentional infliction of emotional distress;

- Summary judgment is granted in favor of Dr. Romeo Aranas on Henderson's second claim for relief alleging excessive force, third claim alleging retaliation, and fourth claim for relief alleging assault and battery; and

- Summary judgment is granted in favor of correctional officers Efrain Lona and Christopher Zuniga on Henderson's third claim for relief alleging retaliation.

The summary-judgment motion is **DENIED in all other respects.** Accordingly, Henderson may proceed only on his claims for relief against Urriola, Lona, and Zuniga alleging excessive force and assault and battery and on his retaliation claim against Urriola, which is limited to the theory that Urriola retaliated by tossing Henderson's cell and physically attacking him. Henderson has no claims for relief against the NDOC, which is only a nominal defendant, and all his claims against Dr. Aranas have been adjudicated in that defendant's favor.

IT IS FURTHER ORDERED that the defendants' motion to seal judicial records **[ECF No. 43] is GRANTED.** The Clerk of Court is directed to **MAINTAIN the seal on ECF No. 44.**

IT IS FURTHER ORDERED that **this case is REFERRED to a magistrate judge for a mandatory settlement conference**. The parties' obligation to file their joint pretrial order is **STAYED** until 10 days after that settlement conference.

Dated: January 25, 2019

_____

U.S. District Judge Jennifer A. Dorsey